**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WISCONSIN**

M.G., I.C., K.M., P.C., and E.H.,[1]

Plaintiffs,

v.

EAST TROY COMMUNITY SCHOOL DISTRICT, PETER SYENS, KRISTA ISERLOTH, CHRISTOPHER HIBNER, and KATHERINE LIESKE HARDER,

Defendants.

Case No. 24-CV-1259-JPS

**ORDER**

## 1. INTRODUCTION

Defendants Peter Syens ("Syens"), Krista Iserloth ("Iserloth"), Christopher Hibner ("Hibner"), and Katherine Lieske Harder ("Harder") were employees of Defendant East Troy Community School District ("the District") (collectively, "Defendants") at a time when the District's band teacher, John Rash ("Rash"), molested several young children. Rash, though not named in this action, was arrested once his abuse came to light and was eventually convicted as a sex offender. Plaintiffs M.G., I.C., K.M., P.C., and E.H. (collectively, "Plaintiffs") brought this action against Defendants alleging violations of their constitutional rights under 42 U.S.C. § 1983 ("§ 1983") and violations of state law. As relevant here, Plaintiffs sued all four of the employee defendants (hereinafter, "Individual Defendants") under § 1983 on a state-created danger theory;

[1]Because of the nature of the underlying events giving rise to this action, Plaintiffs have been permitted to proceed without disclosing their full names. *See* Oct. 11, 2024 Text Order.

they also sued Hibner under § 1983 on a theory of supervisory liability. Now before the Court is the Individual Defendants' motion for partial summary judgment as to these claims.

## 2. LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016) (citing FED. R. CIV. P. 56(a); *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 978 (7th Cir. 2014)). A fact is "material" if it "might affect the outcome of the suit" under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* (citing *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253 (1968)).

The Court construes all facts and reasonable inferences in the light most favorable to the non-movant. *Bridge v. New Holland Logansport, Inc.*, 815 F.3d 356, 360 (7th Cir. 2016) (citing *Burritt v. Ditlefsen*, 807 F.3d 239, 248 (7th Cir. 2015)).

> At summary judgment a court may not assess the credibility of witnesses, choose between competing inferences or balance the relative weight of conflicting evidence; it must view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in favor of the non-moving party.

*Abdullahi v. City of Madison*, 423 F.3d 763, 773 (7th Cir. 2005) (citing *Anderson*, 477 U.S. at 255). Ultimately, "the non-movant need not match the movant witness for witness, nor persuade the court that her case is convincing, she need only come forward with appropriate evidence demonstrating that

there is a pending dispute of material fact." *Waldridge v. Am. Hoeschst Corp.*, 24 F.3d 918, 921 (7th Cir. 1994) (collecting cases). But simply "denying a fact that has evidentiary support 'does not transform it into a disputed issue of fact sufficient to survive a motion for summary judgment.'" *Uncommon, LLC v. Spigen, Inc.*, 305 F. Supp. 3d 825, 838 (N.D. Ill. 2018) (quoting *Roberts v. Advocate Health Care*, 119 F. Supp. 3d 852, 854 (N.D. Ill. 2015)).

## 3. FACTS[2]

### 3.1 Plaintiffs

The District employed Rash as a band teacher from 2001 to March 2022. Plaintiffs M.G., E.H., K.M., P.C., and I.C. attended school in the District. They were in sixth grade during the 2016-2017 school year, seventh grade during the 2017-2018 school year, and eighth grade during the 2018-2019 school year. M.G. was in the band class during her sixth, seventh, and eighth grade years; E.H. was in the class in her sixth and seventh grade years; K.M. was in the class during her sixth grade year and half of her seventh-grade year; P.C. was in the class in her sixth and seventh grade years; and I.C. was in the class during her sixth, seventh, and eighth grade years.

### 3.2 Defendants

Syens was employed by the District as the middle school principal during the relevant time at issue in this lawsuit. Iserloth worked for the District as the middle school counselor during that period. Harder worked for the District as the Director of Special Education and Student Services

[2]The facts in this section are drawn largely from the Defendants' joint statements of undisputed facts, but many are omitted as immaterial. ECF No. 54. The Court did its best to cull out the material facts in light of the parties' failure to do the same. Internal citations will be omitted.

during the relevant time. Hibner worked for the District as the Superintendent during that period.

**3.3 Rash's Sexual Misconduct**

When Plaintiffs were in the band class in middle school, Rash was their band teacher. Plaintiffs attended small group band lessons with Rash approximately once a week. Some of the lessons were solo lessons and some were with other students. For the small group lessons, chairs were placed in a "U" shape, and Rash would generally be seated in the middle of the group of students (or next to the student if it was a solo lesson). Seating in the lessons was not assigned.

E.H. has alleged that, during her sixth and seventh grade (which again was 2016-2017 and 2017-2018 respectively), Rash would touch her breast with the back of his hand during small group band lessons, sometimes the palm of his hand would touch her breast, and sometimes his hand would be fully resting on her breast. The touching with the back of his hand occurred when Rash wanted students to begin playing; he would say "okay" or "begin" and motion with his arms. Additionally, it would occur if Rash was talking to E.H. to get her attention; he would reach out and tap her chest with the back of his hand. Rash would also rest the palm of his hand on E.H's breast when she would be seated to one side of him; he would be talking and pointing at sheet music and then reach out and place his hand on her breast.

E.H. also alleged that Rash rested the palm of his hand on her middle to upper thigh during lessons; while it would not happen every lesson, it would occur once or twice during the lessons when it did occur. He would also tap the beat on her thigh. E.H. alleged that there was an instance where

Rash was showing E.H. where to put the slide on her trombone and he had reached his entire arm across her chest. She did not recall whether that occurred during her sixth or seventh grade year. E.H. also alleged that Rash would touch or play with her hair and shoulders.

### 3.4 E.H.'s Reporting – January 2017

E.H. first spoke with Iserloth in January 2017 (her sixth-grade year) about Rash. The touching by Rash had been occurring for a few weeks before E.H. reached out to Iserloth. E.H. walked into Iserloth's office, told her Rash was touching her on her chest multiple times during lessons, motioned how Rash was touching her, and pointed to where on her body the touching was happening; E.H. told Iserloth about the touching that she alleged to have occurred with the palm of Rash's hand and him placing his hand on her thigh. Iserloth told E.H. she was going to speak with Syens, left the room, and returned 10 or 15 minutes later. Iserloth told E.H. that she and Syens had reviewed the video footage from the band room[3] and that it looked like a misunderstanding and seemed like an accident. During E.H.'s conversation with Iserloth, she was asked if she wanted to report it as sexual assault, and E.H. said no because she did not know what that was and she was scared.

Iserloth and E.H. called E.H.'s mom. Iserloth told E.H.'s mom that they had reviewed the cameras and that it was a misunderstanding and seemed like an accident. Iserloth told E.H.'s mother that Rash was touching E.H. inappropriately, that it made E.H. uncomfortable, that Iserloth and Syens reviewed the video recording and it was a misunderstanding on E.H.'s part, and that the touching was just how Rash teaches. Iserloth also

[3]There are no cameras in the band room.

told E.H.'s mother that they would be watching Rash and talking to him about the way he teaches and how he moved his hands.

Iserloth passed along the information she received from E.H. to Syens. On January 31, 2017, Syens had a conversation with Rash. Rash asked Syens if there was a "bubble" issue and Syens said yes; Rash understood and was aware that a student was uncomfortable. Syens testified that if Rash was disciplined relating to this incident, it would have been a conversation about the spatial arrangement in lessons; however, there is no written record confirming whether any discipline occurred regarding this incident. Hibner does not recall being made aware of the complaint by E.H. in 2017.

### 3.5 Plaintiffs' Collective Reporting – January 2018

The chair arrangement remained the same and nothing changed after E.H. spoke with Iserloth in 2017. E.H. did not speak with anyone at the District about Rash from January 2017 (when she first spoke with Iserloth, *see supra* Section 3.3) until January 2018 when she spoke with Iserloth again.

That is, in January 2018, E.H. went with M.G., K.M., P.C., and another non-party student to speak with Iserloth regarding Rash. E.H. told Iserloth that the touching and behavior had continued, said that it was happening to multiple girls, and used the word "chest." Iserloth called E.H.'s mom and told her that E.H. came to speak with her again with a group of girls and reported that Rash was touching the girls inappropriately and that the school was investigating it.

According to K.M., during her seventh-grade year, the back of Rash's hand (the back of his palm or his fingers) would touch her breast or slightly

above her breast (at approximately the same height of her underarm) while she was playing the flute during small group lessons. Specifically, K.M. alleged that Rash would talk about holding a note, his hands would come out, and he would make contact with her. This contact would occur two to three times per lesson. K.M. does not recall what she said to Iserloth in January 2018. Iserloth spoke with K.M.'s mom and told her K.M. and some other girls reported that the band teacher was touching them in the chest area while conducting during band lessons, that she was proud of the girls, that they would be conducting an investigation, and that the girls could quit band without repercussions if they wanted.

P.C. only recalled Rash touching her during her seventh-grade year. According to P.C., during small group band lessons, Rash would motion with his hands while instructing students to hold a note and would touch her breast approximately two to three times per lesson. Specifically, the blade or ridge of the inside of his hand would make contact with her breast. Rash would regularly keep the beat of the music by slapping her thigh halfway between her knee and her hip. Rash would lean forward towards the music stand and place his hand under her butt and leg. On one occasion during P.C.'s seventh grade year, Rash made a comment that P.C's butt wiggled like a wiggle worm and winked at her. P.C. does not recall what she said to Iserloth in January 2018, but she guessed that she said Rash was touching her and it made her uncomfortable. She thinks she told Iserloth about a "wiggle worm" comment Rash made about her butt. Iserloth called P.C's mom and let her know that P.C. and several girls had come to her office to talk about Rash and something about inappropriate touching. Iserloth asked P.C.'s mom if they could interview P.C.

M.G. asserted that Rash would touch her breasts, slap her on her back, touch her shoulder, and place his hand on the middle of her thigh. Specifically, M.G. alleged that when Rash was instructing students to hold a note, he would reach his arms out and touch his hand to her breast. His hand would be palm up and he would make contact with the outside of his index finger towards his thumb. This occurred anywhere from one to ten times per lesson.[4]

In January 2018, M.G. told Iserloth that they were uncomfortable because they were being touched on the breast area. M.G. was unsure if she used the word "breast," "boob," or "chest" to describe where she was being touched, but she believes that she pointed on her body where she was being touched by Rash. M.G. also reported inappropriate jokes and comments made by Rash. Iserloth called M.G.'s mom after speaking with M.G. and told her that M.G. and four other girls came forward to report that Rash had been touching them on their breasts during small group band lessons. Iserloth said the girls reported that they would be seated next to him in the lessons and that his hands would brush across their breasts or chests while conducting. Iserloth told M.G.'s mother that she had made the principal aware, that they were taking the concerns seriously, and that they would be investigating and addressing the issues based on the results of their investigation.

**3.6 January 2018 Investigation**

After the girls spoke with Iserloth, she contacted Syens. Iserloth told Syens there was a group of girls who were uncomfortable with Rash and

[4]The parties do not provide a timeline as to when M.G. experienced the events described in the foregoing paragraph, but, presumably, if M.G. was in band in sixth and seventh grade, then these events occurred between 2016 and 2018.

that Syens would need to look into that. Syens made the decision to bring in the students and interview them. Syens and Iserloth interviewed the students. Syens informed Hibner that there was a situation where some students had concerns about Rash. E.H. met with Syens. During the meeting, E.H. told Syens about the touching and said Rash "is touching me in my chest." Syens' notes from the meeting state, in part: "band lessons -> touched me in uncomfortable spots," "hands open -> to the one hand in my direction, never towards Amelia," "touch thigh, open hand on thigh," "he apologizes, then does it again," "Jokes make you feel uncomfortable."

K.M. spoke with Syens, Iserloth, and Harder. K.M. told staff that Rash would reach his hands across to instruct students to elongate the note and that the back of his hand would touch her chest 2 to 3 times a lesson and that it made her uncomfortable. K.M. described the touching as "closer to the bottom but not on the breast, right under the clavicle." K.M. quit band after that meeting. Syens' notes from the meeting state, in part: "reaches his hand out and touches your chest," "sometimes, his hand down to his side and it touches your butt, not touching," "how many times, three to four per lesson," "hands out, hands down like once, not a lot," "lessons I get distracted, make it so I can't get touched."

P.C. spoke with Iserloth and Syens; they asked her questions about how Rash touched her and what he did that made her uncomfortable. P.C. told them that Rash was touching her on her chest multiple times per lesson and that he made a comment about how her butt wiggles like a wiggle worm in one of their music lesson books. P.C. was not sure what word she used to describe where she was being touched, but she did use the word "uncomfortable" to describe how it made her feel. P.C. did use her hand to show how Rash touched her and where he touched her, which was her

breast. Syens' notes from the meeting state, in part, "play louder, slap on back during band, open hand touches our chest, hit on my thigh, depends back of hand or open." Syens called P.C.'s mom after they spoke with P.C. and let her know that he was concerned about P.C. and that P.C. had gotten upset during their meeting.

M.G. spoke with Iserloth and Syens and talked about the chair arrangements and how when Rash moved his arms during band lessons he would touch them on their breast, but she was unsure whether she used the word "boob" or "breast" to describe where she was being touched. She did show them where she was being touched by Rash. Syens' notes from the meeting state, in part, "private area, clavicle, shoulder, chest area." After E.H. reported that Rash was touching her in 2018, Rash turned his chair around, so he was seated directly in front of the students but facing them. That seating arrangement lasted for approximately one week. Rash continued touching E.H. when the chairs were moved back. E.H. did not tell anyone at the District that Rash had moved the chairs back. Rash began making comments to E.H. such as "excuse me" and "am I making you uncomfortable?"

After P.C. spoke with Iserloth in January 2018, Rash moved the chairs farther apart for one lesson, but then they were moved back. She did not remember if Rash touched her again after she spoke with Iserloth. P.C. quit band at the end of her seventh-grade year. After M.G. spoke with Iserloth in January 2018, Rash changed his seating arrangement, and he no longer touched her on the breasts.

After Syens and Iserloth met with the students, Syens had a follow up with Rash. Syens told Rash to move the chairs farther away so that when he conducted, he would not have the opportunity to swing his arms and

touch the students. To assure that Rash had moved the chairs, Syens would use proximity supervision by walking through during a series of lessons and looking through the windows of the doors. Syens does not recall how often he did this to observe Rash.

Syens summarized his notes from the meetings with the students in a document, which included, in part, "Individually, students have shared with me their discomfort, anxiety and embarrassment about incidents that have happened to them in band and their lessons", "uncomfortable comments," "physical contact," "band lesson – stretch his arms out and touches you," "hold the note," "4 out of 5 students stated they were touched in their chest/shoulder area," "band lesson – hands down his side and touches you," "3 out of 5 students stated they were touched on the thigh/but area [sic]" and "Mr. Rash will tell the students to scoot closer if you sit far away." Syens testified that a teacher touching a student in those areas would violate the District's harassment policy.

**3.7 Timeline Investigation Report**

Syens generated a timeline investigation report. He substantiated allegations of inappropriate comments and jokes during band lessons and band class. He also noted that students reported experiencing an unnecessary level of expectation that created undo-stress, such as "I don't feel comfortable in [band] anymore," "He pushes us hard, he doesn't understand we have other activities," "I'm worried about Mr. Rash approaching me if I drop band" and "I'm afraid he might come up to me and say something." Lastly, Syens substantiated "boundary issues" concerning the way Rash teaches, noting that he opens his arms while conducting and having students elongate notes. During the process, according to four students, he touches them on their upper chest and

shoulder area with the back of his hand. Syens noted he was able to substantiate contact in the shoulder area.

Rash was directed to "immediately cease the use of physical techniques that involve touching students," "recognize the age and maturity of his students," make jokes that are age appropriate, and not make jokes that make students uncomfortable. Syens recommended that a form of discipline should be imposed; that Rash should complete a book on mindfulness, present his findings and a plan for incorporating those skills into his teaching as it pertains to the well-being of his students; that Rash prepare and present how he will support and maintain the band program while creating a nurturing and age-appropriate environment; and that he be removed as a team leader. The timeline investigation report did not include any information about students reportedly being touched on the breasts, butts, or thighs, despite what the students reported and what was written in Syens' notes, as outlined above.

### 3.8 Letter to Rash

Syens, Rash, and Hibner met on February 27, 2018 to review Syens' findings, conclusions, and recommendations. Dr. Hibner drafted a letter to Rash dated March 9, 2018. In the letter, Dr. Hibner accepted Syens' conclusions and recommendations. In addition, Rash was required to attend a specific in-service session regarding the empowerment of students and then share with Syens ideas on how to implement practices from that in-service into his classroom. The letter and summary of investigation findings were placed in Rash's personnel file.

Hibner was not involved in the investigation and did not look at Syens' notes from the investigation until 2021. His knowledge of the

allegations and findings was limited to what was included in the timeline investigation report.

### 3.9 February 2019 Incident

In February 2019, Syens became aware of an incident where Rash had embarrassed a student by making the student sit in the front of the class because the student was going to miss a band concert; the student's mother had called Syens. Subsequently, M.G.'s mother spoke with Syens and shared what her younger daughter, Amber, had shared with her; specifically, how Amber's classmate had been treated in band earlier that week. M.G.'s mother also brought up how Amber reported that Rash pushed and shoved a student. She also reported that Rash was slapping M.G.'s back and pushed her off a chair and said she did not want Rash touching M.G. or any student. Finally, she reminded Syens that Rash had touched students' breasts while conducting the year before. Because of M.G.'s mother's contact, the investigation was expanded from allegations of embarrassing a student, discussing personal information with a class, and making inappropriate comments and jokes during class, to also include the allegations of boundary issues again.

Syens and Harder investigated the concerns brought to Syens. Syens and Iserloth conducted some of the initial interviews, but Syens and Harder did the remaining ones. Syens and Harder interviewed sixth grade band students, eighth grade band students, and former band students. They also interviewed Rash twice. Syens and Harder determined what students to interview.

### 3.10 I.C.'s Interview

I.C. has alleged that, during her sixth, seventh, and eighth grade years during small group band lessons, Rash would grab her upper thigh

to congratulate her for playing well and would keep the beat by tapping her upper thigh. She also alleged that Rash would act as if he were conducting during lessons and the back of his hand would brush her breast as his hand was going up. She also alleged that, on some occasions, Rash would rest the back of his hand on her breast the entire time she was playing.

In February 2019, I.C. was brought into Syens' office to speak with Syens and Iserloth. I.C. told Syens and Iserloth that Rash had been continually touching I.C. in her breasts multiple times and that he touched her upper thigh. She used the word "boob" and was pretty sure that she showed them with her hands where Rash was touching her. I.C. told the staff that Rash would brush her with the back of his hand when conducting. After I.C. spoke with District staff, Rash did not move the chairs during lessons; nothing changed and Rash continued touching I.C. on her breast and upper thigh.

P.C. again spoke with someone at the District about Rash in February 2019. Specifically, she spoke with Syens and told him that Rash had called her house multiple times after she quit band trying to convince her not to quit and told him that seeing Rash in the hallways made her uncomfortable because she felt like Rash was staring her down.

M.G. spoke with Syens in February 2019 and recalled being asked whether Rash was continuing to touch her breasts, and she said no. The 2019 investigation included interviews with students beyond the named Plaintiffs. Syens' notes include questions to students about class dynamics, statements made by Rash, how Rash provided praise, and how Rash provided feedback. Syens' notes from his student interviews (with four non-party students that the Court need not repeat in detail here) reflect that

Syens did not document sexual misconduct; he did document various other behavior, such as Rash's rubbing of a student's back.

### 3.11 Syens and Harder's Subsequent Findings and Reporting

After students were interviewed in 2019, Syens and Harder interviewed Rash. Syens and Harder drafted a letter to Hibner, dated March 22, 2019, which outlined the complaints, their investigation, the allegations, their findings, and their conclusions. They first identified allegations of public embarrassment within the classroom. They substantiated that, during February 2019, Rash removed a student from her usual seat, placed her at a seat at the front of the class, and asked her not to participate for the remainder of the band class. It was also substantiated that, when Rash did this a second time, he made a comment about the student crying. They also substantiated other comments that Rash made including talking about students missing concerts, comparing band concerts to dance activities, discussing grades of students, and the making of inappropriate comments and jokes. Examples of such remarks include Rash stating "push like you're having a baby" and "what happens in Jazz band stays in band." The letter also identified allegations of "boundary issues," while substantiating that "students felt that there was an invasion of their personal space (i.e., patting them on the back/shoulder, placing his hand on their leg, and/or rubbing their back during band lessons); however, students did not feel the touches were necessarily inappropriate/had sexual implications." They also made additional findings through their investigation, including intimidation or fear by students (students reported fearing or being nervous of disappointing Rash), unreasonable expectations or undue pressure to perform at a heightened level, and feeling uncertain with respect to how

Rash would respond insofar as he often appeared angry or would harbor anger from prior situations.

Syens and Harder concluded that Rash violated Policy 512 (Harassment) and 411.1 (Student Bullying/Harassment/Hazing). They concluded that Rash not only prevented harassment in the classroom, but he was participating in harassing behaviors. Syens and Harder recommended that Rash seek emotional regulation counseling (at no cost to the District); maintain 1-3 feet of personal boundary space during instruction; and cease discussion of student grades or family decisions during classes; and consistently use mindfulness and trauma-related strategies. They also recommended that Rash be placed on a performance improvement plan and that he be suspended without pay. The letter did not include any information about I.C. reportedly being touched on her breast.

**3.12 Hibner's Role**

Hibner did not review the investigators' handwritten notes from the 2019 investigation. His knowledge of the allegations was limited to what was included in the letter from Syens and Harder as outlined above. As such, he was not aware of I.C.'s report about Rash touching her chest. Nor was he aware of any other reports of students that were not included in the summary. As of 2019, Hibner was only aware that, in 2018, Syens had substantiated that Rash had touched students in the shoulder and clavicle area, as well as the details included in Syens' 2018 and 2019 reports, as outlined above. Syens, Harder, Rash, and Hibner met on April 4, 2019 to review the findings, conclusions, and recommendations made by Syens and Harder. Dr. Hibner and Rash met again on April 8, 2019. Hibner drafted a letter to Rash dated April 23, 2019. In the letter, Hibner concluded that

Rash's conduct identified in the findings and conclusions letter warranted disciplinary action. Rash was directed to cease offensive behavior and was to be placed on a performance improvement plan that would be developed by Syens and the Director of Teaching and Continuous Improvement of Student Learning. He was directed to continue to be more cognizant of space boundaries while providing instruction, and he was placed on unpaid administrative leave from May 6 through May 8, 2019.

The letter and summary of investigation findings were placed in Rash's personnel file. The 2018 or 2019 investigations and findings were not reported to the Department of Public Instruction or the District School Resource Officer in 2018 or 2019.[5]

### 3.13 December 2023

In December 2023, Rash pled guilty to two counts of violations of Wisconsin Statute § 948.025(1)(e) (Repeated sexual assault of the same child) which identified P.C. and K.M. as victims. The criminal complaint identified assaults which occurred between August 2017 and July 2018. Seven other criminal charges were dismissed but read in as part of Rash's plea deal. Rash was sentenced to 12 years of initial confinement and 10 years of extended supervision.[6] At his deposition, Rash refused to answer any questions and invoked his Fifth Amendment right.

---

[5]"There were incidents involving Rash unrelated to Plaintiffs which Plaintiffs believe to be relevant to issues of notice." ECF No. 54 at 14. However, the Court does not recite them here as they are irrelevant.

[6]His state case is available online. *State of Wisconsin v. John C. Rash*, Case No. 2023CF000120 (Walworth Cnty. Cir. Ct. 2023), *available at* https://wcca.wicourts.gov/caseDetail.html?caseNo=2023CF000120&countyNo=64&index=0&mode=details.

## 4. ANALYSIS

The Court begins by addressing whether Syens, Iserloth, and Harder are protected against Plaintiffs' § 1983 state-created danger claims by qualified immunity. "Because qualified immunity is an affirmative defense 'available to each individual defendant in his [or her] individual capacity,' a court must structure its analysis defendant-by-defendant and claim-by-claim." *Mabes v. Thompson*, 136 F.4th 697, 706 (7th Cir. 2025) (quoting *Est. of Williams by Rose v. Cline*, 902 F.3d 643, 651 (7th Cir. 2018)). As such, in this case, where Plaintiffs advance multiple claims against multiple defendants, the Court must make the "painstaking commitment to an individualized qualified-immunity analysis." *Id*. (quoting same).[7] For the reasons set forth below, the Court finds that Syens, Iserloth, and Harder are not entitled to qualified immunity for their conduct. *See infra* Section 4.1. As to Hibner, the Court does not reach the issue of qualified immunity, instead finding that Plaintiffs' § 1983 claims against him for state-created danger and supervisory liability must be dismissed. *See infra* Section 4.2.

### 4.1 Qualified Immunity

"[Q]ualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "There are two parts to a qualified-immunity analysis that may be considered in any order." *Vang v. Mellenberger*, No. 25-2197, 2026 WL 1433594, at *2 (7th Cir. May 21, 2026). "First, do the . . . facts show that the [government official's] conduct violated

[7]While the Court will provide separate analyses for each Defendant, it will not provide separate analyses for each Plaintiff.

a constitutional right? Second, is that right clearly established?" *Id*. (citing *District of Columbia v. Wesby*, 583 U.S. 48, 62–63 (2018)). "Upon a defendant's invocation of qualified immunity at summary judgment, the plaintiff shoulders the burden of demonstrating" that these questions can be answered in the affirmative. *Mabes*, 136 F.4th at 705. All the Individual Defendants raise this defense, so the Court breaks up its qualified immunity analysis by Individual Defendants.

#### 4.1.1 Peter Syens

The Court starts its qualified immunity analysis with the principal, Syens, separating its analysis into two sections.

##### 4.1.1.1 Did Syens Violate a Constitutional Right?

For Syens to be held liable under § 1983, Plaintiffs must first show "that the conduct complained of (1) was committed by a person acting under color of state law, and (2) deprived a person of rights, privileges or immunities secured by the Constitution or laws of the United States." *Spencer v. Nat'l R.R. Passenger Corp.*, 141 F. Supp. 2d 1147, 1149 (N.D. Ill. 2001) (quoting *Yang v. Hardin*, 37 F.3d 282, 284 (7th Cir. 1994)).

There is no dispute that Syens, the principal of the public school in question, is a state actor. *See Kolf v. Hansen*, No. 83c8917, 1986 WL 7068, at *1 (N.D. Ill. June 13, 1986) ("[A] school principal can be [a] state actor[] for purposes of § 1983") (citing *Hatton v. Wicks*, 744 F.2d 501 (5th Cir. 1984)). As such, the Court only asks whether Syens has committed a violation of the Constitution, or whether there is a genuine issue of material fact as to the same. *Cf. McAllister v. Price*, 615 F.3d 877, 883–84 (7th Cir. 2010) (affirming portion of district court's summary judgment ruling that there was no qualified immunity because there was "enough evidence to create an *issue of fact* on whether Price's use of force was reasonable" to advance an

excessive force claim) (emphasis added). As relevant here, there are "two kinds of substantive due process violations," the first of which occurs when the state actor's conduct shocks the conscience. *T.E. v. Grindle*, 599 F.3d 583, 589 (7th Cir. 2010) (citing *Rochin v. California*, 342 U.S. 165, 172–73 (1952)). "The second occurs when the state actor violates an identified liberty or property interest protected by the Due Process Clause." *Id*. (citing *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923)).

In the present case, all Plaintiffs proceed on the second type of substantive due process claim, alleging that Syens caused a deprivation of their right to bodily integrity under the Fourteenth Amendment to the Constitution. In accordance with Seventh Circuit teaching, this is a recognized due process right. *Id.* (citing *Ingraham v. Wright*, 430 U.S. 651, 672 (1977)). Syens does not dispute that Rash's conduct violated Plaintiffs' constitutional rights to bodily integrity, *see generally* ECF No. 56, but instead argues that he (and his colleagues) had no affirmative duty to protect students at the school from Rash's abuse. ECF No. 65 at 4 (citing *Cielak v. Nicolet Unified Sch. Dist*., No. 22-CV-819-JPS, 2023 WL 6388933, at *15 (E.D. Wis. Sept. 29, 2023), *aff'd sub nom. Cielak v. Nicolet Union High Sch. Dist.*, 112 F.4th 472 (7th Cir. 2024)).

It is true that "state actors," as a general matter, "do not have a due process obligation to protect citizens from private violence." *Grindle*, 599 F.3d at 589 (citing *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs*., 489 U.S. 189, 195–97 (1989)). It is also true, as Syens points out and Plaintiffs concede, that when considering the two exceptions to that rule, one of them is inapplicable here. *Est. of Her v. Hoeppner*, 939 F.3d 872, 876 (7th Cir. 2019) ("There are two recognized exceptions to the *DeShaney* rule."); *Stevens v. Umsted*, 131 F.3d 697, 701 (7th Cir. 1997); *Grindle*, 599 F.3d at 589 (citing *J.O.*

*v. Alton Cmty. Unit Sch. Dist. 11*, 909 F.2d 267 (7th Cir. 1990)) (noting that the "special relationship" exception does not apply to schools); *Cielak*, 2023 WL 6388933, at *15 (noting that "a school does not have an affirmative constitutional duty to protect its students" (citing *J.K.J. v. Polk County*, 960 F.3d 367, 381 (7th Cir. 2020) and *J.O.*, 909 F.2d at 272–73). However, it is the other exception to *DeShaney*—regarding "state-created dangers"—that enables Plaintiffs to continue this litigation against Syens.

"A due-process claim of this kind requires proof of three elements: (1) the government, by its affirmative acts, created or increased a danger to the plaintiff; (2) the government's failure to protect against the danger caused the plaintiff's injury; and (3) the conduct in question 'shocks the conscience.'" *Hoeppner*, 939 F.3d at 876 (quoting *Flint v. City of Belvidere*, 791 F.3d 764, 770 (7th Cir. 2015)); *see also King ex rel. King v. E. St. Louis Sch. Dist. 189*, 496 F.3d 812, 818 (7th Cir. 2007) (reciting the same elements). The third element regarding shocking the conscience is tantamount to a requirement of deliberate indifference. *Hoeppner*, 939 F.3d at 876 (citing *King*, 496 F.3d at 819). Although this state-created danger exception is "quite narrow and reserved for 'egregious' conduct by public officials," it applies to Syens' conduct for the reasons discussed below. *Id.* (citing *Doe v. Village of Arlington Heights*, 782 F.3d 911, 917 (7th Cir. 2015)).

The Court starts by dispensing with any argument that the third element has not been satisfied. ECF No. 56 at 13–14 (arguing only that it was not met as to Hibner); ECF No. 65 at 8 (same); *Bradley v. Village of Univ. Park*, 59 F.4th 887, 897 (7th Cir. 2023) (by failing to raise an issue at all in the party's opening brief, the issue is waived) (collecting cases). With that resolved, the Court turns to the remaining two elements.

As suggested earlier, the first element requires not only an affirmative act, but also "evidence that the defendant created or increased the danger to an individual." *Wright v. Shumate*, 181 F.4th 742, 749 (7th Cir. 2026) (citing *Doe*, 782 F.3d at 917 and *Sandage v. Bd. of Comm'rs of Vanderburgh Cnty.*, 548 F.3d 595, 599 (7th Cir. 2008)). "It is not enough for a public official's act to merely invite danger." *Id.* (citing *Weiland v. Loomis*, 938 F.3d 917, 919 (7th Cir. 2019)). "And the state is not liable if the individual was in actual danger already, unless it has heightened that danger." *Id.* (citing *Doe*, 782 F.3d at 917–18). "In the 'rare and often egregious' cases in which we have held liability attaches under the state-created danger exception, the plaintiff was 'safe, or at least considerably safer, before' the state intervened." *Id.* (citing *Doe*, 782 F.3d at 917). The Court starts by addressing whether Syens engaged in an affirmative act before turning to the question of whether he created or increased the danger in doing so.

As to the first question, the Court finds that there are genuine issues of material fact as to whether Syens performed any affirmative acts. Most significantly, in January 2017, Syens—armed with the information that Iserloth passed along to him regarding E.H.'s reporting of Rash's sexual touching of E.H.—confronted Rash, which, by all accounts, did not lead to anything more than a change in the spatial arrangement of the classroom. Indeed, even that is uncertain. ECF No. 54 at 3 ("Syens testified that if Rash was disciplined relating to this incident, it would have been a conversation about the spatial arrangement in lessons; however, there is no written record confirming whether any discipline occurred regarding this incident."). And, Hibner, the superintendent of the District, does not recall being made aware of the complaint by E.H. in 2017. Therefore, much like in *Sandra T.E. v. Sperlik*, the record contains evidence from which a jury might

infer that Syens "swe[pt] the allegations under the rug," thereby sending an "implicit message" to Rash "that despite criminal behavior," Syens "would do nothing to report his misconduct to other persons within the [D]istrict or otherwise punish him but would instead help him conceal it." 639 F. Supp. 2d 912, 923 (N.D. Ill. 2009), *aff'd sub nom.*, *Grindle*, 599 F.3d 583.

Syens may also have mislead others (on more than one occasion) in the District by suggesting Rash only had a "boundary problem," a distinct affirmative act. *Id.* at 922 (discussing affirmative acts and noting that "Grindle lied not only to [the victim's] parents . . . but also . . . other school district employees"); *cf. Guertin v. State*, 912 F.3d 907, 926 (6th Cir. 2019) ("[m]isleading Flint's residents as to the water's safety—so that they would continue to drink the water and Flint could continue to draw water from the Flint River—is no different than the forced, involuntary invasions of bodily integrity that the Supreme Court has deemed unconstitutional."); *Briscoe v. Potter*, 355 F. Supp. 2d 30, 44–45 (D.D.C. 2004) (because the "allegations are not premised upon the notion that [d]efendants violated their substantive due-process rights solely by failing to warn them of a known risk or to provide them with a safe working environment" but rather on "affirmative misrepresentations about the safety of the facility," it was appropriate to allow the state-created danger claim to proceed).

Turning now to whether Syens created or increased the danger, the Court finds that there is a genuine issue of material fact in this respect as well. In this regard, Syens' attempted analogies are not on point. ECF No. 56 at 11–12 (citing *Doe*, 782 F.3d at 917; *Monfils v. Taylor*, 165 F.3d 511 (7th Cir. 1998); *Paine v. Carson*, 678 F.3d 500 (7th Cir. 2012); and *Windle v. City of Marion*, 321 F.3d 658 (7th Cir. 2003)). Only *Doe* and *Windle* warrant discussion, as they are the only situations that involve allegations of state

actors concealing ongoing sexual abuse (and, in any event, a discussion of the other cases would result in redundant analysis).

In *Doe*, law enforcement arrived at an apartment complex in response to a 911 call and left without intervention after finding a heavily intoxicated underage female with three males; that female was subsequently sexually assaulted. 782 F.3d at 913. In *Windle*, police officers intercepted multiple phone calls between two women whom they initially believed to be lesbian lovers; a city sergeant was made aware of the conversations and began intercepting the conversations over the next two months. 321 F.3d at 660. Eventually, he learned that "the participants were an older female who was a middle school teacher and a younger female who was a student." *Id*. Despite this knowledge, the officers failed to intervene or take any action, and the abuse continued. *Id*.

Both of these cases are distinct from the facts here. Unlike *Doe*, the allegations are not limited to a failure to report, investigate, or address—allegations that caselaw strongly implies are insufficient. *See Collins v. City of Harker Heights*, 503 U.S. 115, 126 (1992) (failure of government employers to warn its employees about known dangers and to provide its employees with a safe working environment does not rise to the level of a constitutional violation); *accord Sperlik*, 639 F. Supp. 2d at 922 ("something more than a mere failure to investigate" is required); *Gremo v. Karlin*, 363 F. Supp. 2d 771, 783 (E.D. Pa. 2005) (citing *D.R. by L.R. v. Middle Bucks Area Vocational Tech. Sch*., 972 F.2d 1364, 1373–76 (3d Cir. 1992)) (finding "school defendants' failure to report, investigate, and address the incidents . . . did not establish a state-created danger"). Nor are the allegations here mere puffery. *Windle*, 321 F.3d at 662 (rejecting the notion that plaintiff's characterization of the misconduct as "affirmatively choosing to stand idle"

was sufficient to constitute an affirmative act). "Rather," as was the case in *Grindle*, Plaintiffs "allege that [Syens] is liable for actively concealing reports of abuse and creating an atmosphere that allowed abuse to flourish." 599 F.3d at 590.

Furthermore, it is not as though there is only speculation as to what dangers Plaintiffs would have faced but for Syens' actions. *Windle*, 321 F.3d at 662 (pointing out that there was "no assurance that the danger would not have existed in the absence of the so-called affirmative action of doing nothing."). To borrow from the words of the *Briscoe* court, Syens' conduct "intentionally misled Plaintiffs into believing the [band room/Rash] was safe and prevented them from acting to preserve their own safety." 355 F. Supp. 2d at 45. And, to borrow from the *Gremo* court, in "covering up the incidents . . . and failing to address the danger," Syens "placed [the Plaintiffs] and other students at a greater risk of similar incidents." 363 F. Supp. 2d at 787. Accordingly, the Court finds that there is a genuine issue of material fact as to the first element.

As to the remaining element—causation—the Court faces a challenging question: having found that Syens may have "create[d] or increase[d] a danger," the Court must also determine whether his affirmative actions constitute "both the actual and proximate cause of the harm." *Wright*, 181 F.4th at 749 (quoting *Flint*, 791 F.3d at 770). In other words, the Court must ask, as the Defendants' proposed jury instructions direct, whether a jury could find that Syens' actions actually and proximately caused Plaintiffs' injuries. ECF No. 58 at 2. As discussed earlier, there is a genuine dispute of material fact as to whether Syens sent a message in January 2017, when he confronted Rash, that Rash's conduct would be tolerated. It is also undisputed that all Plaintiffs believed they

experienced inappropriate touching by Rash during seventh grade, a school year that, in this case, spanned from 2017-2018. At this stage, the Court, when drawing all inferences in the non-moving party's favor, must conclude that there is genuine issue of material fact as to both proximate and actual causation. The Court reaches the same conclusion to the extent that Plaintiffs continued to experience sexual abuse at the hands of Rash following the issuance of the timeline investigation report, which, again, arguably concealed the nature of Rash's activities.

Although the parties' briefing on causation is insufficient, the Court will not intervene in an issue that is otherwise best left for the jury's consideration. As there is a genuine issue of material fact regarding the elements of Plaintiffs' state-created danger claims against Syens, the Court turns to the next step in deciding whether qualified immunity applies to Syens.

**4.1.1.2 Was the Right Clearly Established?**

The next step in the qualified immunity analysis is determining whether Plaintiffs can establish that the constitutional right was clearly established at the time that Syens violated it. *Mellenberger*, 2026 WL 1433594, at *2. "There are two ways to prove th[is] second part." *Taylor v. Weitzman*, 470 F. Supp. 3d 806, 811 (N.D. Ill. 2020). "First, a plaintiff can identify a reasonably analogous case that articulates the right at issue and concerns a similar set of facts." *Id*. (citing *Leiser v. Kloth*, 933 F.3d 696, 701 (7th Cir. 2019)). "The case need not be identical but must be 'some settled authority' that would put a reasonable [state actor] on notice that his actions violated the Constitution." *Id*. (quoting *Kloth*, 933 F.3d at 702). "Alternatively, a plaintiff can demonstrate that the violation was so obvious that any reasonable person would have recognized it violated the law." *Id*. (quoting

*Kloth*, 933 F.3d at 701). "Under either approach, 'existing precedent must have placed the statutory or constitutional question beyond debate.'" *Id*. (quoting *Kloth*, 933 F.3d at 702). "Finally, the right must be viewed 'in light of the specific context of the case, not as a broad general proposition,' which requires examining 'whether the violative nature of particular conduct is clearly established.'" *Id*. (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015)).

In this case, there is a clear case on point, *Grindle*, which demonstrates that Syens' conduct was plainly against the Constitution at the time of his violations. 599 F.3d at 590. In fact, when *Grindle* was decided in March 2010, there was already enough persuasive caselaw to find that was settled authority prohibiting the conduct in question here. *Id*. ("While district court decisions alone do not clearly establish a right for the purpose of qualified immunity, the number and unanimity of these decisions, combined with our circuit-level precedent, show that a reasonable school principal would have concluded that she could be held liable for turning a blind eye to and affirmatively covering up evidence of child sexual abuse by one of her teachers.").[8]

---

[8] The Court notes that Syens is incorrect in arguing that *Grindle* does not address a state-created danger claim. Indeed, a quick review of the operative complaint in that case at the time of the district court's summary judgment ruling dispels that notion immediately. Fourth Amended Complaint at 17, *Sandra T.E. v. Sperlik*, No. 1:05-cv-00473 (N.D. Ill. June 21, 2007), ECF No. 348 (the Fourth Amended Complaint alleges a claim under Section 1983 for "state created danger/special relationship"); *see generally id*. (mentioning failure to intervene under federal law and failure to supervise under state law but nowhere raising supervisory liability claim or *Monell* municipal policy/custom claim); *see also Grindle*, 599 F.3d at 589–90 (discussing *DeShaney*, for which there are, as discussed earlier, only two exceptions, and finding the special relationship exception inapplicable).

For the foregoing reasons, the Court finds that Syens is not protected by qualified immunity. Because Plaintiffs do state a state-created danger claim against Syens, *see supra* Section 4.1.1.1, it will proceed for the jury to decide.

### 4.1.2 Krista Iserloth

The Court next performs the qualified immunity analysis as to the school counselor, Iserloth. The Court has already decided that there is clear precedent that satisfies the second prong of qualified immunity. *See supra* Section 4.1.1.2. As such, the Court will focus its analysis on the first prong—to the extent the analysis is not redundant.

As previously explained, for a state actor to be held liable under § 1983, Plaintiffs must first show "that the conduct complained of (1) was committed by a person acting under color of state law, and (2) deprived a person of rights, privileges or immunities secured by the Constitution or laws of the United States." *Spencer*, 141 F. Supp. 2d at 1149 (citation omitted). The parties do not dispute that Iserloth, a school counselor, constitutes a state actor.[9] As such, the Court need only inquire whether Iserloth has committed a violation of the Constitution, or whether there is a genuine issue of material of fact as to the same. To do so in this case, Plaintiffs must, for the reasons provided earlier, establish: "(1) the government, by its affirmative acts, created or increased a danger to the plaintiff; (2) the government's failure to protect against the danger caused

[9]Employees of a school district are considered municipal employees under Wisconsin state law. *See* WIS. STAT. §111.70(i). However, under §1983, "a plaintiff may recover against municipal employees acting under color of state law . . . . " *Regaldo v. Hayes*, No. 11C1472, 2011 WL 5325542, at *3 (N.D. Ill. Nov. 3, 2011).

the plaintiff's injury; and (3) the conduct in question 'shocks the conscience.'" *Hoeppner*, 939 F.3d at 876 (quoting *Flint*, 791 F.3d at 770).

Here, the Court finds that, as was true for Syens, any argument that Iserloth's conduct does not shock the conscience is waived, for failure to brief the point in her opening brief. *Bradley*, 59 F.4th at 897. In other words, the Court only asks the first two questions.

The Court finds that there are genuine issues of material fact as to the first question. For instance, Iserloth misrepresented to E.H. that she and Syens had reviewed the footage, which did not even exist, and informed her that "it looked like a misunderstanding and looked accidental." ECF No. 54 at 3. Iserloth then went so far as to call E.H.'s mother to deliver the same message. *Id*. As was the case for Syens, such misrepresentations about the sexual abuse are sufficient to demonstrate an affirmative act. *Sperlik*, 639 F. Supp. 2d at 922 (noting the "evidence that Grindle lied . . . to C.E.'s and Jane Doe # 2's parents about the nature of the girls' allegations"); *cf*. *Guertin*, 912 F.3d at 926 ("[m]isleading Flint's residents as to the water's safety . . . is no different than the forced, involuntary invasions of bodily integrity that the Supreme Court has deemed unconstitutional."); *Briscoe*, 355 F. Supp. 2d at 44–45 (finding affirmative action for a state-created danger claim when defendants intentionally misled plaintiffs into believing facility was safe). In turn, these allegations are, for reasons already elaborated on, sufficient to establish Plaintiffs faced a greater risk of danger because of Iserloth's actions. *See supra* Section 4.1.1.2 (citing *Briscoe*, 355 F. Supp. 2d at 45 and *Gremo*, 363 F. Supp. 2d at 787).

As to both proximate and actual causation, the Court, at this stage, when drawing all inferences in the non-moving party's favor, must conclude that there is a genuine issue of material fact. After all, as discussed

above, there is a genuine dispute of material fact as to whether Iserloth was less than forthcoming in her conversations with E.H., her mother, and Syens (and perhaps other school officials) in January 2017. It is also undisputed that all Plaintiffs believed they experienced inappropriate touching by Rash during seventh grade, a school year that, in this case, spanned from 2017-2018.

As there is a genuine issue of material fact regarding the elements of Plaintiffs' state-created danger claims against Iserloth and clear precedent regarding the violation, the Court finds that Iserloth is not protected by qualified immunity. As Plaintiffs do state a claim against Iserloth for state-created danger, the claim will be for the jury to decide.

**4.1.3 Katherine Lieske Harder**

The Court next performs the qualified immunity analysis as to the Director of Special Education and Students Service, Harder. As the Court has explained, for a state actor to be held liable under § 1983, Plaintiffs must first show "that the conduct complained of (1) was committed by a person acting under color of state law and (2) deprived a person of rights, privileges or immunities secured by the Constitution or laws of the United States." *Spencer*, 141 F. Supp. 2d at 1149 (citation omitted). The parties do not dispute that Harder constitutes a state actor. Thus, the Court need only inquire whether Harder has committed a violation of the Constitution, or whether there is a genuine issue of material fact as to the same.

Because the Court has already decided that there is clear precedent that satisfies the second prong of qualified immunity, *see supra* Section 4.1.1.2, the Court will just focus on the first prong of the qualified immunity analysis—to the extent it is not redundant.

Again, Plaintiffs in this case must establish: "(1) the government, by its affirmative acts, created or increased a danger to the plaintiff; (2) the government's failure to protect against the danger caused the plaintiff's injury; and (3) the conduct in question 'shocks the conscience.'" *Hoeppner*, 939 F.3d at 876 (quoting *Flint*, 791 F.3d at 770). Here, the Court finds that, as was true for Syens and Iserloth, any argument that Harder's conduct does not shock the conscience is waived, for failure to brief the point. *Bradley*, 59 F.4th at 897. In other words, the Court only analyzes the first two questions.

The Court finds that there are genuine issues of material fact as to the first question. For instance, the parties agree that, in February 2019, Harder (and Syens) conducted interviews of current and former band students, and that in March 2019, they detailed their findings, omitting an incident of sexual abuse involving I.C., and submitted them to Hibner, the superintendent, for his review. Indeed, drawing all inferences to the nonmoving party, one can conclude that Harder was less than forthcoming in her findings, amounting to an affirmative act. In turn, these allegations are, for reasons already elaborated on, sufficient to establish Plaintiffs faced a greater risk of danger as a result of Harder's actions. *See infra* Section 4.1.1.2 (citing *Briscoe*, 355 F. Supp. 2d at 45 and *Gremo*, 363 F. Supp. 2d at 787).

As to both proximate and actual causation, the Court, at this stage, when drawing all inferences in the non-moving party's favor, must conclude that there is a genuine issue of material fact. After all, as just discussed, there are facts giving rise to the inference that Harder fabricated her findings to the superintendent in March 2019. It is also undisputed that, at the very least, I.H. reported Rash's sexual abuse of I.H. continued following I.H's February 2019 interview with Syens and Iserloth. At this

stage, the Court cannot say with certainty whether the other Plaintiffs continued to experience sexual abuse. In the absence of more information, and better briefing *by both parties* in this regard, the Court declines to intervene in a matter otherwise best left for the jury in a case that has lagged long enough. *See Lynch v. Ne. Reg'l Commuter R.R. Corp*., 700 F.3d 906, 910–11 (7th Cir. 2012) (suggesting that courts should not grant summary judgment to a party on a ground not argued unless there has been notice and opportunity to be heard (citing FED. R. CIV. P. 56(f)).

As there is a genuine issue of material fact regarding the elements of Plaintiffs' state-created danger claims against Harder and clear precedent regarding the violation, the Court finds that Harder is not protected by qualified immunity. As Plaintiffs do state a claim against Harder for state-created danger, the claim will go to the jury to decide.

### 4.2 Viability of § 1983 Claims Against Christopher Hibner

The Court concludes by analyzing whether Plaintiffs can continue their § 1983 claims against Hibner under a state-created danger or supervisory liability theory. As discussed, for a state-created danger claim, Plaintiffs must establish: "(1) the government, by its affirmative acts, created or increased a danger to the plaintiff; (2) the government's failure to protect against the danger caused the plaintiff's injury; and (3) the conduct in question 'shocks the conscience.'" *Hoeppner*, 939 F.3d at 876 (quoting *Flint*, 791 F.3d at 770). For a supervisory liability claim, a plaintiff must show "that the supervisor was personally involved in the constitutional violation." *Gill v. City of Milwaukee*, 850 F.3d 335, 344 (7th Cir. 2017) (citing *Matthews v. City of E. St. Louis*, 675 F.3d 703, 708 (7th Cir. 2012)).

Common to both claims is the standard of deliberate indifference. *Hoeppner*, 939 F.3d at 876 (noting that the third element of a state-created

danger claim—shocking the conscience—is tantamount to a requirement of deliberate indifference) (citing *King*, 496 F.3d at 819); *Vance v. Rumsfeld*, 701 F.3d 193, 204 (7th Cir. 2012) (en banc) (applying deliberate-indifference standard in supervisory liability case); *see also Bostic v. Murray*, 160 F.4th 831, 841–42 (7th Cir. 2025) (citing *Martinez v. Santiago*, 51 F.4th 258, 262 (7th Cir. 2022)). As this element is common to both theories, the Court will present this analysis just once.

Here, Hibner presents a compelling argument that he had no awareness of the ongoing sexual molestation. Hibner was not involved in the interviews, and his knowledge was limited to what was reported to him by his staff; by all accounts, his staff omitted relevant information about the sexual abuse and otherwise downplayed Rash's sexual abuse. While there may have been other notable events before and during Plaintiffs' time at the District involving Rash and students, *see supra* note 5, none of them involved sexual abuse. Thus, as one court put it under similar circumstances, "there is no indication that []he knew the extent, character, or frequency of the molesting." *Gremo*, 363 F. Supp. 2d at 786 (discussing *D.R. by L.R.*). As such, there is no issue of material fact as to either the state-created danger claim or the supervisory liability claim as it concerns Hibner. Accordingly, the Court is obliged to grant these portions of the Individual Defendants' partial motion for summary judgment in their favor, and Plaintiff's § 1983 claims against Hibner, under a state-created danger theory and a supervisory liability theory, will be dismissed with prejudice.

**5. OFFICIAL/INDIVIDUAL CAPACITIES**

Plaintiffs bring their state-created danger claim against Defendants in both their official and individual capacities, and Defendants now seek

summary judgment on the claim in both capacities. ECF No. 1 at 15; ECF No. 53. Defendants' only official-capacity specific argument in their pleadings is that without an "underlying constitutional violation, there can be no official capacity claim." ECF No. 57 at 8 (footnote 3) (citing *Gonzalez v. McHenry Cnty., Illinois*, 40 F.4th 824, 830 (7th Cir. 2022)).

Because the Court has determined there is a genuine issue of material fact regarding the state-created danger claim for Syens, Iserloth, and Harder, Defendants' motion for summary judgment against these three on the state-created danger claim is denied for both capacities.

In regard to Hibner, because the Court finds no genuine issue of material fact concerning the state-created danger claim against Hibner in his individual capacity, and there can be no official capacity claim without an "underlying constitutional violation," Defendants' motion for summary judgment on the state-created danger claim against Hibner is granted for both capacities. Plaintiffs also bring their supervisory liability claim against Hibner in both his individual and official capacity. ECF No. 1 at 17. Defendants do not indicate whether they seek summary judgment on the supervisory liability claim against Hibner in both his individual and official capacity. However, considering the Court finds there is no issue of material fact as to the supervisory liability claim, it will be dismissed with prejudice for both capacities.

## 6. MOTIONS TO SEAL

There are multiple motions to seal currently pending on the docket.[10] ECF Nos. 59, 61, 63. Parties may seek to have a document either "restricted"

[10] Defendants' motions to seal are stylized as motions to restrict on the docket, but in turning to their substance, they are, in fact, motions to seal. *See* ECF Nos. 59 and 63.

or "sealed." GEN. L.R. 79(d)(1). Restricted documents can be accessed only by the Court and counsel for both parties, whereas only the Court can access sealed documents. *Id*. In either case, under General Local Rule 79(d), "[a]ny motion to restrict access or seal must be supported by sufficient facts demonstrating good cause for withholding the document or material from the public record." GEN. L.R. 79(d)(3). "Documents that affect the disposition of federal litigation are presumptively open to public view, even if the litigants strongly prefer secrecy, unless a statute, rule, or privilege justifies confidentiality." *In re Specht*, 622 F.3d 697, 701 (7th Cir. 2010). This presumption supports public confidence in the judiciary by enabling oversight and facilitating the understanding of judicial decisions. *See Gonzales v. Home Nursery Inc*., No. 14-cv-1140-MJR-DGW, 2016 WL 6705447, at *1 (S.D. Ill. Sept. 22, 2016) (citing *Goessel v. Boley Int'l, Ltd*., 738 F.3d 831, 833 (7th Cir. 2013)).

Public interest in the judicial process, however, can be overridden if the movant demonstrates "good cause for sealing a part or the whole of the record[.]" *Citizens First Nat. Bank of Princeton v. Cincinnati Ins. Co*., 178 F.3d 943, 945 (7th Cir. 1999) (collecting cases). The Seventh Circuit has "insisted that litigation [is to] be conducted in public to the maximum extent consistent with respecting trade secrets, the identities of undercover agents, and other facts that should be held in confidence." *Hicklin Eng'g, L.C. v. Bartell*, 439 F.3d 346, 348 (7th Cir. 2006), *abrogated on other grounds by RTP LLC v. Orix Real Est. Cap., Inc*., 827 F.3d 689, 691–92 (7th Cir. 2016).

In this instance, the Court agrees that the victims' names should be held in confidence, *see supra* footnote 1; however, the parties advance no reason why restricting, as opposed to sealing, is insufficient to accomplish this goal. The Court finds none. Accordingly, Defendants' motion, ECF No.

51, will be denied to the extent it seeks to seal the unredacted statement of facts and the opening brief; it will be granted insofar as each document will be placed under restriction. To the extent there are concerns about documents influencing judicial decisions being available to the public, the Court notes this is not a problem as there are redacted versions on the docket already. *See* ECF Nos. 54 and 56 (redacted versions of each). As such, the Clerk of Court shall maintain the documents at ECF Nos. 55 and 57 until restriction until further order of the Court.

This same analysis holds true as to Plaintiffs' motion to seal their unredacted response brief, ECF No. 61, and Defendants' motion to seal their unredacted reply brief, ECF No. 63.[11] As such, the Court will deny Plaintiffs' motion, ECF No. 61, to the extent it seeks to seal but will grant it to the extent it seeks to restrict their unredacted response brief; the Clerk of Court shall maintain the document at ECF No. 62-1 under restriction until further order of the Court. Similarly, the Court will deny Defendants' motion, ECF No. 63, to seal to the extent it seeks to seal but will grant it to the extent it seeks to restrict their unredacted reply brief; the Clerk of Court shall maintain the document at ECF No. 64 under restriction until further order of the Court.

## 7. CONCLUSION

For the foregoing reasons, the Court is constrained to deny in part and grant in part the Individual Defendants' motion for partial summary judgment. To the extent the Individual Defendants seek summary judgment as to Plaintiffs' § 1983 claim for state-created danger against

[11]Redacted versions of both briefs are available on the docket. *See* ECF Nos. 62 and 65.

Syens, Iserloth, and Harder, their motion is denied. To the extent the Individual Defendants seek summary judgment as to Hibner, their motion is granted; Plaintiffs' § 1983 claims for state-created danger and for supervisory liability against Hibner in both his individual and official capacities will be dismissed with prejudice. As to the parties' motions to seal, they are denied in part and granted in part, as described herein.

Accordingly,

**IT IS ORDERED** that Defendants Peter Syens, Krista Iserloth, Christopher Hibner, and Katherine Lieske Harder's motion for partial summary judgment, ECF No. 53, be and the same is hereby **GRANTED in part and DENIED in part** as provided in this Order; to the extent they seek summary judgment as to Plaintiffs' claim under 42 U.S.C. § 1983 for state-created danger against Defendants Peter Syens, Krista Iserloth, and Katherine Lieske Harder, their motion be and the same is hereby **DENIED**; to the extent they seek summary judgment as to Plaintiffs' claims under 42 U.S.C. § 1983 for state-created danger and for supervisory liability against Defendant Christopher Hibner, their motion be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that Plaintiffs' claims under 42 U.S.C. § 1983 for state-created danger (Count III) and for supervisory liability (Count IV), ECF No. 1, be and the same are hereby **DISMISSED with prejudice** as to Defendant Christopher Hibner in both his individual and official capacities;

**IT IS FURTHER ORDERED** that Defendants' motions to seal, ECF Nos. 59 and 63, be and the same are hereby **GRANTED in part and DENIED in part**; to the extent the motions seek to seal the underlying documents, the motions are denied; to the extent the motions seek to restrict

the underlying documents, the motions are granted; the Clerk of Court shall maintain the documents at ECF Nos. 55, 57, and 64 under restriction until further order of the Court; and

**IT IS FURTHER ORDERED** that Plaintiffs' motion to seal, ECF No. 61, be and the same is hereby **GRANTED in part and DENIED in part**; to the extent the motion seeks to seal the underlying document, the motion is denied; to the extent the motion seeks to restrict the underlying document, the motion is granted; the Clerk of Court shall maintain the document at ECF No. 62-1 under restriction until further order of the Court.

Dated at Milwaukee, Wisconsin, this 30th day of September, 2026.

BY THE COURT:

J. P. Stadtmueller
U.S. District Judge